**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| KUMAR PATEL and RAJESH PATEL, on behalf of themselves and all others similarly situated,<br><br>                              *Plaintiff*,<br><br>                    v.<br><br>AMERICAN AIRLINES GROUP, INC., AMERICAN AIRLINES, INC., DELTA AIRLINES, INC., SOUTHWEST AIRLINES CO., UNITED CONTINENTAL HOLDINGS, INC., and UNITED AIRLINES, INC.,<br><br>                              *Defendants*. | Civil Action No.:<br>**15-cv-07659**<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, Kumar Patel ("K. Patel") and Rajesh Patel ("R. Patel") (collectively "Plaintiffs"), by their undersigned attorneys, bring this civil antitrust action, individually and on behalf of a class of all those similarly situated, for treble damages and injunctive relief under the United States antitrust laws against American Airlines Group, Inc., American Airlines, Inc. (collectively, "American"); Delta Airlines, Inc. ("Delta"); Southwest Airlines Co. ("Southwest"); United Continental Holdings, Inc. and United Airlines, Inc. (collectively, "United") (all collectively "Defendants"), and allege, based upon investigation of counsel and upon information and belief, as follows:

## I.      INTRODUCTION

1.      This antitrust class action seeks treble damages and injunctive relief under the United States antitrust laws against Defendants the largest airlines in the United States, for unlawfully fixing, raising, maintaining and/or stabilizing the price of domestic travel. These

airlines collectively account for more than 80% of all domestic travel. Plaintiffs bring this action on their own behalf and on behalf of all persons and entities who directly purchased domestic airline travel in the United States from the Defendants, their subsidiaries, affiliates, predecessors and/or co-conspirators between October 1, 2012 and the present (the "Class Period").

2.      The domestic airline travel industry possesses some of the hallmark characteristics conducive to antitrust behavior: (a) a heavily concentrated market dominated by a few companies (here, over 80% of the market is controlled by Defendants); (b) significant barriers to entry; (c) membership in trade associations that foster Defendants' ability to exchange competitive information; and (d) pricing behavior (described herein) that is inconsistent with competitive market pricing.

3.      As alleged herein, Defendants conspired to limit routes and available seats to limit capacity to keep domestic airfares artificially elevated. Plaintiffs allege that Defendants accomplished this by illegally signaling to each other how quickly they would add new flights, routes, extra seats, and to maintain "discipline."

4.      On or about July 1, 2015, the U.S. Department of Justice ("DOJ") announced that it initiated an investigation into the anticompetitive behavior of the domestic airline industry by four major airlines (Defendants herein) – American, Delta, Southwest, and United.

5.      Specifically, the DOJ sent a letter to the aforementioned airline carriers and demanded documents related to communications the airlines had with each other, Wall Street analysts, and major shareholders about "the undesirability of your company or any other airline increasing capacity." Emily Pierce, a Justice Department spokeswoman, confirmed that, "We are investigating potential unlawful coordination among some airlines."

6.      As alleged herein, Defendants entered into an illegal agreement, combination, or

conspiracy to raise the price of domestic travel in the United States. As a result of Defendants' unlawful conduct, Plaintiffs and members of the Class (defined below) paid higher prices for air travel in the U.S. than they would have paid in a competitive market.

## II.    JURISDICTION AND VENUE

7.    Plaintiffs' claim for injuries sustained by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, are brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees.

8.    This Court has original federal question jurisdiction over the Sherman Act claim asserted in this Court, pursuant to 28 U.S.C. §§1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

9.    Venue is proper in this judicial district pursuant to Sections 4(a) and 12 of the Clayton Act, 15 USC §§15 and 22, and 28 USC §1391(b), (c), and (d), because, during the Class Period, one or more of the Defendants resided, transacted business, were found, or had agents in this district, and a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce described below, has been carried out, in this district.

## III.    PARTIES

### A.    Plaintiffs

10.    K. Patel is an individual who resides in Alabama. During the Class Period, K. Patel purchased tickets for domestic air travel directly from Delta for travel between Huntsville, Alabama, and Atlanta, Georgia; New York, New York; Charlotte, North Carolina; Las Vegas, Nevada; Newark, New Jersey; and San Antonio, Texas. K. Patel suffered antitrust injury as a

result of the violations alleged in this Complaint.

11.     R. Patel is an individual who resides in Alabama.  During the Class Period, R. Patel purchased tickets for domestic air travel directly from Delta for travel between Huntsville, Alabama, and Atlanta, Georgia; New York, New York; Charlotte, North Carolina; Las Vegas, Nevada; Houston, Texas; Newark, New Jersey; Washington, D.C.; and Miami, Florida.   R. Patel suffered antitrust injury as a result of the violations alleged in this Complaint.

**B.**     **Defendants**

**1.**     **American**

12.     American Airlines Group Inc. is a holding company and the parent company of American Airlines, Inc.  Both American Airlines Group, Inc. and American Airlines, Inc. are Delaware corporations, with their principal places of business located in Fort Worth, Texas.

13.     American was formed in December 2013 as a result of the merger of AMR Corporation, the previous parent company of American Airlines, and U.S. Airways Group, the previous parent company of US Airways.  The new American is the largest airline in the world, operating nearly 6,700 flights per day to 339 locations in 54 countries.  During the Class Period, American, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and/or agreeing to fix domestic airfare at artificially inflated levels.

**2.**     **Delta**

14.     Delta is a Delaware corporation with its principal place of business located in Atlanta, Georgia.  Delta is the oldest operating airline in the United States (founded in 1924) and operates more than 5,400 flights per day to 326 locations in 64 countries.  During the Class Period, Delta, either directly or through a subsidiary, participated in the conspiracy alleged in this

Complaint, including by restricting capacity and/or agreeing to fix domestic airfare at artificially inflated levels.

**3**.    **Southwest**

15.    Southwest is a Texas corporation with its principal place of business located in Dallas, Texas.  Southwest carries the most domestic passengers of any U.S. airline and operates more than 3,600 flights per day to 94 locations in the U.S and six additional countries.  During the Class Period, Southwest, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and/or agreeing to fix domestic airfare at artificially inflated levels.

**4**.    **United**

16.    United Continental Holdings, Inc. is a holding company and the parent company of United Airlines, Inc.  Both United Continental Holdings, Inc. and United Airlines, Inc. are Delaware corporations, with their principal places of business located in Chicago, Illinois.

17.    United offers service to more destinations than any other airline in the world, operating more than 5,300 flights per day to 369 locations across six continents.   During the Class Period, United, either directly or through a subsidiary, participated in the conspiracy alleged in this Complaint, including by restricting capacity and/or agreeing to fix domestic airfare at artificially inflated levels.

## IV.    FACTUAL ALLEGATIONS

**BACKGROUND**

18.    The domestic airline industry has been deregulated since 1978 when Congress enacted the Airline Deregulation Act ("ADA").  The ADA removed all governmental control over fares, routes and market entry of new airlines, allowing market forces to dictate these and other

facets of the industry.

19. Since 1978, Defendants have competed over fares, routes, and seats. In recent years, however, the airline industry has seen significant implicit and express coordination, which has led to higher fares, new and increased fees, and less options for American consumers.

20. The last decade has seen the domestic airline industry experiencing significant consolidation. It began in 2005 with the merger between US Airways and America West. In 2008, Delta and Northwest Airlines merged, and in 2010, United and Continental merged. In 2011, Southwest and AirTran merged, and, most recently, in 2013, American and US Airways merged, creating the largest airline in the world.

21. Initially, the DOJ opposed the merger between American and US Airways. In August, 2013, it initiated an antitrust lawsuit against the two companies seeking to block the merger. *United States v. US Airways Group, Inc.*, No. 13-cv-01236 (D.D.C. 2013) ("DOJ Complaint"). The DOJ Complaint painted a stark picture of an extremely consolidated market, dominated by five major airlines—American, Delta, Southwest, US Airways, and United—who airlines that wielded their enormous market power to increase fares while decreasing capacity.

22. The DOJ Complaint warned that the merger of American and US Airways "would make it easier for the remaining airlines to cooperate, rather than compete, on price and service." It noted that the "structure of the airline industry is already conductive to coordinated behavior: Few large players dominate the industry; each transaction is small; and most pricing is readily transparent." *Id.* ¶ 41. It provided examples of such coordination, including competitors closely watching each other's pricing moves and frequently following price increases; using "cross-market initiatives," where a competitor, to deter discounting, responds to an airline offering a discounted fair in one market with its own discount in another market in which the discounting airline prefers

a higher fare; and direct communications between competitors designed to discourage or punish airlines who set off price wars. *Id.* ¶¶ 42-45.

23.     Despite its initial opposition to the proposed merger, the DOJ eventually reached a settlement with American and US Airways that allowed the merger between the two airlines to take place. As part of the settlement, the airlines had to give up a number of gates at major airports in Washington D.C., New York, Los Angeles, Chicago, Boston, Dallas, and Miami.

24.     The result of the merger between American and US Airways and other mergers is that, since 2005, the number of major domestic airlines has dropped from nine to four. The remaining four major airlines—American, Delta, Southwest, and United—accounted for nearly 80% of the domestic airline market in 2014:

25.     Defendants account for over 80% of the domestic airline market today.



2014 Share of Domestic Passenger Revenue

Source: U.S. Department of Transportation via MIT Airline Data Project; American Airlines share includes US Airways.

26.     Airline passengers have suffered harm from the consolidation of the domestic

airline market. Defendants have, in tandem, raised prices, imposed new fees on travelers, reduced seats, and decreased routes and flights, leaving American consumers with fewer choices and causing them to pay hundreds of millions of dollars in increased airfare and additional fees for checked baggage, flight changes, etc.

## CAPACITY "DISCIPLINE"

27.     Defendants have improperly utilized increased consolidation in the domestic airlines market to exercise "capacity discipline."   This means that Defendants are restraining growth by limiting flights and seats, charging higher prices, providing reduced services and getting larger profit margins.

28.     The DOJ Complaint stated that after each significant airline legacy merger ("legacy" airlines are American, Delta, and United), substantial reductions in capacity have followed.  "These capacity reductions have not consisted simply of cancellation of empty planes or empty seats; rather, when airlines have cut capacity after a merger, the number of passengers they carry on the affected routes has also decreased."  DOJ Complaint. ¶ 60.

29.     During the relevant time period, each Defendant recognized that one of the ways by which each Defendant could maintain high airfares and increase profits was to maintain "capacity discipline."   This limitation on capacity would not be possible with the influx of competition and flights from the other Defendants and any other airline of comparable size.

30.     For example, during a 2011 interview with *Fortune Magazine*, United's Jeff Smisek stated what the recession taught United:

> What we learned is the importance of capacity discipline. Ours has been an industry where it's very easy to add seats, through increased frequencies, flying the aircraft longer, or taking delivery of additional aircraft.  In the recession we were very disciplined in getting our capacity down, and as we saw the recovery with high fuel prices, we've been very disciplined at United and across the industry in making sure

we've got the right level of capacity and not supplying overcapacity, driving down pricing.[1]

31.     Smisek maintained this view even as the economy improved and in the face of record profits.  He stated in 2015, "We're going to run the airline for profit maximization and we're very focused on capacity discipline . . . We will absolutely not lose our capacity discipline."[2]

32.     Similarly, Delta's chief executive, Richard Anderson, in announcing Delta's 2014 fourth quarter results stated, "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014.  Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."[3]

33.     More recently, Anderson echoed Smisek's comments above by stating, "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . . In fact, we continue to trim capacity on the margin to maintain yields."[4]

34.     Prior to the American-US Airways merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to follow the rest of the industry in exercising "capacity discipline."

35.     American's president, Scott Kirby, on March 3, 2015, confirmed at an investment conference that the company would not be adding capacity via additional airplanes:  "Almost all

---

[1]http://archive.fortune.com/2011/04/19/news/companies/jeff_smisek_united_continental.fortune/index.htm.

[2] http://atwonline.com/blog/maintaining-capacity-discipline.

[3] http://ir.delta.com/news-and-events/news/news-release-details/2015/Delta-Air-Lines-Announces-December-Quarter-Results/default.aspx.

[4] http://atwonline.com/blog/maintaining-capacity-discipline.

of our capacity growth domestically is about putting more seats on airplanes."[5]

36.     At the same conference, Kirby confirmed that each of the four Defendants were interested in increasing capacity only by way of cramming additional seats onto airplanes: "All airlines for the most part are putting more seats on airplanes. We're doing it. United's doing it. Delta's doing it. Even Southwest is continuing to put more seats on their [sic] existing aircraft. *Once you've done that, you're done*."[6]

37.     Southwest, too, has explicitly signaled its intention to reduce capacity. As *Bloomberg* reported, Southwest's chief executive officer, Gary Kelly, said in an interview on June 1, 2015: "We don't want to grow 8 percent, we're not going to grow 8 percent and we can easily trim the schedule to stick to 7 percent [expansion of available seat miles]."[7]

38.     Defendants' reduction in capacity has led to higher fares despite a decrease in costs. Historically, airfare has been tied to the price of fuel, which is the largest operating cost for airlines. In a competitive market, lower fuel costs should result in lower fares. However, in an anticompetitive market, such as the market Defendants operate in, they are free to, and in fact, do, fix the price of fares at supracompetitive levels.

39.     As long as capacity is limited, there is no incentive for airlines to reduce fares, no matter how low fuel prices go.

40.     As seen in the below chart, where jet fuel prices have significantly declined over the last four years, the price of domestic airfare has actually *increased*:

---

[5] http://www.dallasnews.com/business/airline-industry/20150303-u.s.-airlines-are-growing-without-adding-airplanes.ece.

[6] http://www.dallasnews.com/business/airline-industry/20150303-u.s.-airlines-are-growing-without-adding-airplanes.ece (emphasis added).

[7] http://skift.com/2015/06/01/southwest-to-limit-growth-after-expansion-plan-scared-the-market/.



41.     And, as seen in the following chart, the average fares for each of the Defendants'

routes—in which they lead in market share—have remained incredibly stable over the last three

years.  This would not be the case in a competitive market, since competing airlines would attempt

to   earn   market   share   by   offering   discounted   fares   on   their   rivals'   routes.



**THE INTERNATIONAL AIR TRANSPORT ASSOCIATION**

42.    On June 11, 2015, *The New York Times* published an article titled "'Discipline' for Airlines, Pain for Fliers," which was revealed one of Defendants' mechanisms for collusion, *i.e.*, industry conferences.

43.    Defendants reinforced their commitment to the collusion – which they referred to as "discipline" - through industry conferences, including the International Air Transport Association ("IATA") meetings.

44.    "Discipline" is a euphemism used by Defendants for limiting flights and seats, higher prices and fatter profit margins.

45.    From June 7-9, 2015, the annual meeting of the world's top airline executives took place at the IATA conference in Miami.

46.    At this meeting, Delta's president, Ed Bastian, stated that Delta was "continuing with the discipline that the market place is expecting."

47.    At this same meeting, Air Canada's chief executive, Calin Rovinescu, stated, "People were undisciplined in the past, but they will be more disciplined this time."

48.    At this meeting, an American executive stated that the airlines had learned their lessons from past price wars: "I think everybody in the industry understands that," he told Reuters.

49.    Fiona Scott Morton, an economics professor at Yale University and a former deputy attorney general in the DOJ's antitrust division, is quoted in *The New York Times* article as saying, "When airline industry leaders say they're going to be 'disciplined,' they mean they don't want anyone to expand capacity.  And when there aren't enough seats, airlines raise prices.  That's what we've been seeing."

50.    This year, the "discipline" has been paying off:  the IATA projected that airline industry profits would more than double in 2015 to nearly $30 billion – an industry record.

51.    In May 2015, Southwest's chief executive, Gary C. Kelly, considered breaking ranks and announced that Southwest was going to expand capacity in 2015 by as much as 8 percent, with the expansion spilling over into 2016.

52.    However, after coming under fire at the IATA conference in June 2015, Kelly quickly changed his position and stated, "We have taken steps this week to begin pulling down our second half 2015 to manage our 2015 capacity growth, year-over-year, to approximately 7 percent."

53.    The IATA meeting was an example of the industry conferences at which

Defendants agreed to restrict capacity increases to keep ticket prices high.

54.     Peter Fitzpatrick, a spokesman for Air Canada, stated, "We are taking a disciplined approach to our business, not adding capacity in an attempt to simply expand market share but instead focusing on profitable growth."

## U.S. SENATORS CALL FOR INVESTIGATION

55.     In December 2014, U.S. Senator Charles Schumer (D-N.Y.) called for a federal investigation of U.S. airlines amid falling gas prices.

56.     Senator Schumer stated, "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. …. So I'm urging the feds to step in and do a price investigation on behalf of consumers who must buy holiday travel tickets that can break the bank."

57.     In mid-June 2015, U.S. Senator Richard Blumenthal (D-Conn.) asked the DOJ to immediately investigate collusion and anti-competitive behavior amongst U.S. airline companies following the IATA annual meeting.

58.     In his letter to Assistant Attorney General William Baer, Blumenthal cited the DOJ's investigation into the merger and the initial DOJ Complaint, which said, "The structure of the airline industry is already conducive to coordinated behavior … the legacy airlines closely watch the pricing moves of their competitors. When one airline 'leads' a price increase, other airlines frequently respond by following with price increases of their own."

## DOJ REQUESTS INFORMATION FROM DEFENDANTS ABOUT CAPACITY

59.     The DOJ is now investigating whether Defendants colluded to restrain capacity and drive up fares.  On July 1, 2015, Defendants confirmed that the DOJ had requested information from them about capacity and other things.

60.     Specifically, according to the *Associated Press*, the DOJ sent a Civil Investigative

Demand ("CID") to each of the Defendants, seeking documents and information related to the following:

a.   Tell us who in your company sets the communications strategy to shareholders, investors or analysts and who does that communication.

b.   Give us any documents "discuss[ing] (a) the need for, or the desirability of, capacity reductions or growth limitations by the company or any other airline; or (b) the undesirability of your company or any other airline increasing capacity."

c.   Give us any of your documents that talk about changes in your capacity or that of your competitors.

d.   Give us any communications between you and outside parties about your capacity or that of your competitors and how capacity changes affect fares, revenues or profits.

e.   Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have involving industry analysts (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

f.   Tell us the time and place of any conference, meeting or appointment, including telephone calls, you have had involving other airlines in which capacity was discussed (we want your appointment books, day planners, calendars, etc., as well as any materials preparing for such contacts).

g.   We want to know everybody who owns at least 2 percent of your company, including the time that person owned that much of your company.

h. Concerning those people who owned at least 2 percent, tell us about all your meetings, appointments or conferences with those people in which industry capacity was discussed. We want to see any calendars, appointment books, day planners, etc., that were involved, as well as any documents prepared for those discussions and which talked about those discussions afterward.

i. We want to know how much capacity you flew, in available seat miles, every month since January 2010, and please include the seat miles flown by your regional partners as well.

j. Spell out your document retention policy including emails.

k. Tell us who is preparing this information and submitting it to us. If someone gives that preparer some oral instructions, tell us who gave the oral instructions and what he and she said.

61. According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation.  In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed."  Ch. III § B(1).  Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy.  *The greater the potential significance of the matter, the more likely the request to open an investigation will be approved*."  *Id.* (emphasis added).

## V.    TRADE AND COMMERCE

62.    During the Class Period, each Defendant, or one or more of its subsidiaries, sold tickets for domestic air travel in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

63.    During the Class Period, Defendants collectively controlled a vast majority of the market for domestic air travel in the United States.

64.    The business activities of Defendants substantially affected interstate trade and commerce in the United States and caused antitrust injury in the United States.

65.    To the extent Defendants' conduct alleged herein occurred outside the United States, such conduct involved import trade or import commerce, was directed at customers in the United States, and had a direct, substantial, and reasonably foreseeable effect on import trade or import commerce.

## VI.    CLASS ACTION ALLEGATIONS

66.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), on behalf of the following Class:

> All persons and entities who purchased domestic air travel in the United States directly from one or more Defendants between October 1, 2012 and the present. Excluded from the Class are Defendants, their parent companies, subsidiaries and affiliates, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

67.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants. Plaintiffs believe that due to the nature of the trade and commerce involved, there are most likely millions of Class members geographically dispersed throughout the United States, such that joinder of all Class members is impracticable.

68.    Plaintiffs are members of the Class. Plaintiffs' claims are typical of the claims of

the Class in that Plaintiffs are direct purchasers of domestic air travel in the United States. Plaintiffs and Class members were damaged by the same wrongful conduct of Defendants and their co-conspirators as alleged herein, and the relief sought is common to the Class.

69.     Numerous questions of law or fact common to the Class arise from Defendants' anticompetitive behavior, including, but not limited to the following:

a.     whether Defendants combined or conspired to fix, raise, maintain, or stabilize the price of domestic airfare in the United States;

b.     whether Defendants combined or conspired to restrict the supply of seats sold on domestic flights in the United States;

c.     whether Defendants shared non-public information, allocated markets and customers, restricted the supply of seats sold on domestic flights in the United States, and committed other conduct in furtherance of the alleged conspiracy;

d.     whether Defendants' conduct caused the prices of domestic airfare in the United States to be at artificially high and non-competitive levels;

e.     whether Plaintiffs and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members; and

f.     whether Plaintiffs and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

70.     These and other questions of law and fact are common to the Class, and predominate over any questions affecting only individual Class members, including legal and

factual issues relating to liability and damages.

71.     Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of one or more domestic flight(s) and have no conflict with any other members of the Class.  Furthermore, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

72.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

73.     This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, effectively, and without the duplication of effort and expense that numerous individual actions would engender.  Prosecution as a class action will eliminate the possibility of repetitive litigation. Class treatment will also permit the adjudication of relatively small claims by Class members who otherwise could not afford to litigate an antitrust claim such as that asserted herein.  There will be no material difficulty in the management of this action as a class action.

74.     The Class is readily definable and is one for which records likely exist in the files of Defendants and their co-conspirators.

75.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.    FIRST CAUSE OF ACTION
## CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1

76.     Plaintiffs allege and incorporate by reference all of the above allegations as if fully set forth herein.

77.     Beginning at least as early as October 1, 2012, the exact date being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), by artificially reducing or eliminating competition in the United States.

78.     In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the price of domestic airfare in the United States.

79.     As a result of Defendants' unlawful conduct, prices for domestic airfare were raised, fixed, maintained and stabilized in the United States.

80.     The combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their co-conspirators.

81.     For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did those things they combined or conspired to do, including:

  a.     participating in meetings and conversations to discuss the prices and capacity of domestic seats and flights in the United States;

  b.     communicating in writing and orally to fix prices and manipulate the capacity of domestic seats and flights in the United States;

  c.     agreeing to manipulate prices and the capacity of domestic seats and flights in the United States sold throughout the world and in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

  d.     issuing price announcements and/or price quotations in accordance with the agreements reached;

  e.     selling seats on domestic flights in the United States at non-competitive

20

prices; and

f.      providing false statements to explain increased prices for airfare for domestic flights in the United States.

82.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for domestic airfare than they otherwise would have paid in the absence of Defendants' unlawful conduct.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter judgment on their behalf and on behalf of the Class herein, adjudging and decreeing that:

A.      This action may proceed as a class action, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.      Defendants have combined and conspired in a *per se* violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiffs and the members of the Class have been injured in their business and property as a result of Defendants' violations;

C.      Plaintiffs and the members of the Class shall recover damages sustained by them, as provided by the federal antitrust laws, and that judgment in favor of Plaintiffs and the Class be entered against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

D.      Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf shall be permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

E.      Plaintiffs and the members of the Class shall be awarded pre-judgment and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial Complaint in this action;

F.      Plaintiffs and the members of the Class shall recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.      Plaintiffs and the members of the Class shall receive such other or further relief as may be just and proper.

## IX.    JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: August 31, 2015

Respectfully submitted,

POMERANTZ LLP

*/s/ Jayne Goldstein*
Jayne A. Goldstein (IL Bar No. 6310724)
POMERANTZ LLP
10 S. LaSalle Street, Ste. 3505
Chicago, IL 60603
Tel.: (312) 377-1181
Fax: (312) 377-1184
Email: jagoldstein@pomlaw.com

Natalie Finkelman Bennett
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
35 E. State Street
Media, PA  19063
Tel.:  (610) 891-9880
Fax:  (610) 891-9883
Email:  nfinkelman@sfmslaw.com

Nathan C. Zipperian
SHEPHERD, FINKELMAN, MILLER
 & SHAH, LLP
1640 Town Center Circle, Suite 216

Weston, FL  33326
Tel:  (954) 515-0123
Fax:  (866) 300-7367

*Attorneys for Plaintiffs*